IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JANELLE LYNN LANE                                                                PLAINTIFF

V.                                    CIVIL NO. 2:14-cv-02188-MEF

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                                                   DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Janelle Lynn Lane, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claim for supplemental security income (SSI) under the provisions of

Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's decision.

*See* 42 U.S.C. § 405(g).

**I.  Procedural Background**

Plaintiff protectively filed an application for SSI on December 7, 2011, alleging disability

since June 30, 2011[1], due to a litany of alleged physical and mental conditions, including "diabetes,

deg disc disease, depression, artery disease, etc.; detereated (sic) disk; arthritis; diabetes; depression;

neuropathy; high blood pressure; pain over most of my body; has to use a cane sometimes legs." (T.

188, 209) Her application was denied initially on February 22, 2012 and upon reconsideration on

May 14, 2012. (T. 93, 94, 98-101, 105-107) Plaintiff requested an administrative hearing (T. 108-

_____

[1] Plaintiff filed an earlier application for DIB in 2009, which application was denied at the
hearing level on June 29, 2011. (T. 204-205) The denial of that application is administratively
final and not at issue in this case.

110), and the hearing was held on March 12, 2013, before the Hon. Bill Jones, Administrative Law

Judge (ALJ). (T. 73-92) Plaintiff was present and represented by her attorney, Kimberly Mueller. (T.

73, 75)

Plaintiff, born in November, 1964, was 48 years old at the time of the hearing. (T. 204) She

completed a high school education in May 1983, and she attended beauty college in 1991. (T. 210)

She worked as a beautician from September 1991 to August 2009. (T. 210, 216, 223) Plaintiff

stopped working on August 29, 2009 because of a bad back and diabetic neuropathy. (T. 76-77, 190)

By a written Decision dated March 28, 2013, the ALJ found Plaintiff had the following

severe impairments: obesity; diabetes mellitus; osteoarthritis in the cervical and lumbar spine;

factitious disorder, not otherwise specified, with psychological and physical symptoms; and,

histrionic, passive-aggressive and parasitic-dependent personality traits. (T. 17) After reviewing all

of the evidence presented, the ALJ determined Plaintiff's impairment did not meet or equal the level

of severity of any impairment in the Listing of Impairments. (T. 17-19) The ALJ found Plaintiff had

the residual functional capacity ("RFC") to perform light work, except as follows:

> "the claimant is limited to simple, routine, and repetitive tasks, involving
> only simple work related decisions with few, if any, workplace changes.
> Further, the claimant can have no more than incidental contact with co-
> workers, supervisors, and the general public." (T. 29-30)

The ALJ determined that Plaintiff had no past relevant work; was a younger individual, age

18-49, on the date her application was filed; had at least a high school education and is able to

communicate in English; and, that transferability of job skills was not an issue as Plaintiff did not

have any past relevant work. (T. 25) Considering the Plaintiff's age, education, work experience, and

RFC, the ALJ determined that there are jobs that exist in significant numbers in the national

economy that Plaintiff can perform. (T. 25) With the assistance of a vocational expert, Montie U. Lumpkin, the ALJ determined that Plaintiff could perform the requirements of representative light, unskilled occupations such as a compression molding machine tender (DOT#556.685-022), riveting machine operator II (DOT#699.685-030), and bindry machine feeder and offbearer (DOT#653.686-026), of which there are 2,583 jobs in Arkansas and 254,748 in the national economy, and occupations in production and assembly, such as toy assembler (DOT#731.687-034), bottling line attendant (DOT#920.687-042), and conveyor line bakery worker (DOT#524.687-022), of which there are 9,506 jobs in Arkansas and 832,588 in the national economy. (T. 25-26, 89-90) The ALJ then concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since December 7, 2011, the date Plaintiff's application for SSI was filed. (T. 26)

Plaintiff requested a review of the hearing decision by the Appeals Council (T. 11), which request was denied on June 25, 2014 (T. 1-5). Plaintiff then filed this action on August 29, 2014. (Doc. 1) This case is before the undersigned pursuant to the consent of the parties. (Doc. 7) Both parties have filed appeal briefs (Docs. 11, 12, 13), and the case is ready for decision.

## II.  Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). The Court must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial

evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the Court must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in

light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th

Cir. 1982); 20 C.F.R. § 416.920(a)(4)(v).

### III.  Discussion

Plaintiff argues two points on appeal: (1) that the ALJ erred at step two by not finding

Plaintiff's peripheral neuropathy was a severe impairment; and, (2) that the ALJ's RFC assessment

is not supported by substantial evidence. (Doc. 11, p. 12) The Commissioner counters that the ALJ

correctly determined Plaintiff's severe impairments, and that substantial evidence does support the

ALJ's RFC determination. (Doc. 12, pp. 5, 10) The Commissioner also points out that as the only

issues Plaintiff has raised in this appeal relate to her alleged physical impairments, Plaintiff has

waived any issues relating to the ALJ's findings that: Plaintiff has a severe mental impairment of

factitious disorder, NOS with psychological and physical symptoms, and histrionic, passive-

aggressive parasitic-dependent personality traits; that Plaintiff is not fully credible; and, that Plaintiff

retains the mental RFC to perform work involving simple tasks with simple instructions, and with

no more than incidental interpersonal contact with others. The Court agrees with the Commissioner

that these issues have been waived. *See Walton v. Astrue*, 334 Fed.Appx. 38, 2009 WL 3255501, at

\*1 (8th Cir. Oct. 13, 2009), *citing Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) (claims not

raised in the opening brief are waived). *See also Horn v. Colvin*, 2015 WL 5698042, at \*4 (D.S.D.

Sept. 28, 2015) (as claimant did not address the proposed additional severe impairment associated

with her right knee, the issue was waived); *Gossett v. Colvin*, 2015 WL 736898, at \*8 (W.D.Ark.

Feb. 20, 2015) (as claimant did not dispute finding that he could perform work at all exertional

levels, he had waived any issue regarding that finding).

The Court has thoroughly reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and they are repeated here only to the extent necessary.

### A.  Step Two Analysis

At step two of the familiar five-step sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4); *Simmons v. Massanari*, 264 F.3d 751, 754 (8th Cir. 2001). An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 416.920(c), 416.921; *Bowen v. Yuckert*, 482 U.S. 137 (1987)(O'Connor, J., concurring). If the impairment would have no more than a minimal effect on a claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). It is the claimant's burden to establish that an impairment or combination of impairments are severe. *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000). Severity is not an onerous requirement for the claimant to meet, *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989), but it is also not a toothless standard, and courts have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. *See, e.g., Page v. Astrue*, 484 F.3d at 1043-44; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Simmons*, 264 F.3d at 755; *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997); *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir. 1996). A mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *Buckner v. Astrue*, 646 F.3d 549, 556-57 (8th Cir. 2011).

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006)

(quoting 20 C.F.R. § 404.1520(c)). The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by the claimant's statement of symptoms. 20 C.F.R. §§ 416.908, 416.927.

Plaintiff urges that the ALJ should have also determined that her peripheral neuropathy was a severe impairment. (Doc. 11, pp. 12-15) This argument fails. The record, taken as a whole, simply does not establish that Plaintiff's peripheral neuropathy resulted in any severe functional impairments.

Plaintiff alleged neuropathy as a disabling condition. (T. 209) She points to her Function Report and Pain Report to support her allegations of disabling pain in her hands and feet. (T. 231, 235) She testified to symptoms of neuropathy at the administrative hearing. (T. 77) She also points to medical evidence of her complaints and a diagnosis of neuropathy. (Doc. 11, p. 14) As noted above, however, an impairment must be established by more than a mere diagnosis or by a claimant's statement of symptoms. Here, the only thing of record is a mere diagnosis and Plaintiff's occasional subjective complaints of peripheral neuropathy symptoms.

While Plaintiff has been diagnosed with diabetes mellitus, and the diagnosis has been confirmed by laboratory test results (T. 298, 416, 420-421), the same cannot be said about Plaintiff's diagnosis of peripheral neuropathy. There are no diagnostic test results, e.g., nerve conduction studies, to confirm Plaintiff's alleged neurological symptoms of pain, "pins and needles," "drawing up" of her hands, and trouble grasping things. Not only are there no diagnostic test results to confirm

peripheral neuropathy, the Plaintiff has on numerous occasions during the relevant period denied any neurological symptoms, and findings on physical examinations have been normal.

On October 7, 2011, two months before making her application for benefits, she reported to the emergency room at Summit Medical Center with a complaint of chest pain. During a review of systems, she denied any neurological weakness, numbness, or tingling, and a physical exam showed her to be grossly intact, with no focal deficits or other neurological abnormalities noted. Her extremities showed no deformities or abnormalities, and she had normal range of motion of all four extremities. (T. 297) On December 9, 2011, two days after making her application for benefits, she reported no neurological symptoms to her physician, Dr. Stephen Carney, and no neurological examination was even performed. (T. 327-328) Despite alleging disability since June 30, 2011, Plaintiff reported no neurological complaints, and a neurological exam was normal on June 22, 2011. (T. 333-334)

During other physician visits in 2011, 2012 and 2013, Plaintiff consistently reported no neurological symptoms. (T. 329-330, 331-332, 402-403, 404-405, 452-453) She did complain of "continued pain in legs" on June 19, 2012, but no neurological symptoms were noted in the review of systems, and no neurological exam was performed. (T. 450-451) When she appeared at the Wilma P. Mankiller Health Clinic on September 20, 2012 to begin receiving care and medications there, peripheral neuropathy was not documented as an active problem (T. 461, 465), and while a history of "dm neuropathy" was noted (T. 465), the review of systems revealed no neurological symptoms such as dizziness, weakness, or numbness (T. 467), and a neurological exam showed that Plaintiff moved her extremities well and her gait was normal (T. 469). Although Plaintiff reported neuropathy in both legs at her initial visit to the Wellness Clinic of Roland on October 23, 2012, no exam or

diagnostic testing was done or ordered, and the diagnosis of peripheral neuropathy appears to be based solely on Plaintiff's subjective report. (T. 528) When Plaintiff was seen at the emergency room at Sparks Regional Medical Center on November 26, 2012 following a minor motor vehicle collision, the only neurologic symptom she reported was a headache, and a physical exam revealed no peripheral neuropathy. (T. 492-493) She again reported no symptoms of peripheral neuropathy at her physician visits on December 20, 2012 (T. 518) and January 7, 2013 (T. 511).

Plaintiff saw a consultative medical examiner, Chester L. Carlson, D.O., on January 11, 2012 for a general physical examination. Dr. Carlson's examination showed normal range of motion and no heat, swelling, or tenderness in all extremities; normal reflexes bilaterally; no muscle weakness or atrophy; no sensory abnormalities; normal gait and coordination; normal limb function, including the ability to hold a pen and write, to touch fingertips to palm, to oppose thumb to fingers, to pick up a coin, to stand and walk without assistive devices, and to walk on heel and toes; and, a 100% grip bilaterally. (T. 347-348) Dr. Carlson found no significant dysfunction on examination. (T. 349)

Upon careful consideration of the evidence of record, the ALJ's determination that Plaintiff's peripheral neuropathy does not constitute a severe impairment is supported by substantial medical evidence.

## B. RFC Determination

Plaintiff next argues that the ALJ's RFC assessment is not supported by substantial evidence. (Doc. 11, pp. 15-17) More specifically, Plaintiff faults the ALJ for not including postural limitations in his RFC assessment associated with Plaintiff's back pain. (Doc. 11, pp. 16-17)

RFC is the most a person can do despite that person's limitations, and it is assessed using all relevant evidence in the record. 20 C.F.R. § 416.945(a)(1). This includes medical records,

observations of treating physicians and others, and the claimant's own descriptions of limitations. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). A claimant's RFC is a medical question, therefore, an ALJ's determination concerning a claimant's RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). The ALJ is required to specifically set forth a claimant's limitations and to determine how those limitations affect his RFC. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003).

Plaintiff points to medical evidence that documents degenerative disc disease in both her cervical and lumbar spine, her persistent reports of chronic back and neck pain, prescriptions for potent narcotic pain medications, and decreased range of motion in her back. (Doc. 11, pp. 16-17) She asserts that her "well documented postural limitations," notably an inability to stoop, would adversely affect the light occupational base. (Doc. 11, p. 17) Her alleged postural limitations are not "well documented" in the record, however, and her argument is untenable.

When making a RFC determination, an ALJ is obligated to perform a credibility analysis of a claimant's subjective statements about pain or other symptoms and their functional effects. *See* SSR 96-7P, 1996 WL 374186, *4. The ALJ cited *Polaski v. Heckler*, 739 F.2d 1320, 1321-1322, 751 F.2d 943, 948 (8th Cir. 1984) as providing the proper test for evaluating a claimant's subjective complaints, and he recited the factors set forth in SSR 96-7P. (T. 20) Applying those guidelines to the evidence of record, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely

credible for the reasons discussed in the Decision. (T. 21) Those reasons include reference to

Plaintiff's ability to perform activities of daily living that are generally inconsistent with allegations

of disability; the inconsistency of her claim that she cannot afford certain of her medications, but she

continues to smoke cigarettes; that she has not tried to retrain in any other vocation and has not even

considered such retraining; and, that a consultative examiner questioned her veracity. (T. 21)

That consultative examiner, Kathleen M. Kralik, Ph.D., not only questioned Plaintiff's

veracity, but actually diagnosed Plaintiff with "Factitious Disorder NOS: with combined

psychological and physical symptoms - subsuming treatment noncompliance and maladaptive health

behaviors; with the purpose of taking on the sick role AND deriving financial and psychosocial

secondary gain." (T. 358) "The essential feature of factitious disorder is the falsification of medical

or psychological signs and symptoms in oneself . . ." *See* Diagnostic and Statistical Manual of

Mental Disorders, p. 325 (5th Ed. 2013) ("DSM-5"). The diagnosis of factitious disorder does not

exclude the presence of a true medical condition or mental disorder, as comorbid illness often occurs

in the individual along with factitious disorder, e.g., "individuals who might manipulate blood sugar

levels to produce symptoms may also have diabetes." DSM-5, p. 326.

Noting that "[t]his is claimant's third or fourth application for Disability benefits," and after

finding that there is "no evidence of psychosis, a major mood or anxiety disorder, or organic

impairment," Dr. Kralik stated, "the primary issue seems to be ongoing neglect of lifestyle/health

management issues of a nature likely to maintain and even intensify her underlying health conditions;

notably her perception of pain, complications of diabetes, and general health and well-being." (T.

351) Dr. Kralik went on to explain, "the lifestyle choices she persists in making as both passively

and actively likely to worsen her perception of her physical and mental health and well being are not

surprisingly continuing to allow her to justify at some level an ongoing avoidance of workplace participation that could objectively be considered as reasonably within her alleged limitations to access." (T. 352) Dr. Kralik commented that, "[i]t is absolutely not doubted claimant will continue applying for benefits until these are awarded[,] as she has nothing to lose in doing so[,]" and "[s]he will likely continue engaging in behaviors likely to 'help her case along' by causing further deterioration with ongoing deliberate actions likely to bring this about." (T. 359-360)

As previously mentioned, Plaintiff has not challenged the ALJ's findings that Plaintiff has a severe mental impairment of "factitious disorder NOS, with psychological and physical symptoms, and histrionic, passive-aggressive parasitic-dependent personality traits," that she is not fully credible, and that she retains the mental RFC to perform work involving simple tasks and instructions and incidental interpersonal contact; therefore, she has waived any issues related to those findings in this case.

Turning to the medical evidence of record, the ALJ properly considered Plaintiff's osteoarthritis in the cervical and lumbar spine when making his RFC assessment. He considered that Plaintiff underwent a series of MRI exams on January 25, 2011. (T. 22) The cervical MRI revealed "small" disc protrusions at C5-6, C6-7, and possibly a "very small" protrusion at T4-5, without definite canal stenosis. (T. 289-290) The impression of the lumbar spine MRI was "no significant disc protrusion," possibly a "tiny" central protrusion or prominent bulge at T11-12 and along the right side at L5-S1 and L3-4. (T. 289-290) During six visits to her physician during 2011, Plaintiff did not present with complaints of back pain; and, although the treatment notes do reflect back pain in the review of systems, the physical examinations all showed normal findings regarding her neck and only some unspecified decreased range of motion in Plaintiff's back in February, April, June,

and December. (T. 327-328, 333-334, 335-336, 337-338) Physical exams in August and October,

2011 revealed normal findings as to both Plaintiff's neck and back. (T. 330, 332)

When Plaintiff went to Summit Medical Center on October 7, 2011 with complaints of some

chest pain, the orthopaedic review was normal, with no stiffness, pain, or swelling noted, and the

physical exam demonstrated no problems with Plaintiff's neck, back, or extremities. (T. 297)

At her general physical examination by Dr. Carlson on January 11, 2012, no abnormalities

in Plaintiff's neck or back were seen. Range of motion was normal in her cervical and lumbar spine,

no muscle spasm was observed, and straight-leg raising tests were negative bilaterally. Plaintiff's

reflexes and muscle strength were normal, and she demonstrated no gait or coordination deficits. (T.

347-348) From a review of Plaintiff's diagnostic studies, Dr. Carlson concluded that Plaintiff had

mild osteoarthritis in her lumbar spine, and based on his examination and evaluation Dr. Carlson

found no significant dysfunction. (T. 349)

When Plaintiff returned to her physician on April 9, 2012, she reported "continued back pain

over past few days" and that Lorcet was not effective. (T. 402) Physical exam resulted in normal

findings, except some unspecified decreased range of motion in her back. No changes in Plaintiff's

conservative treatment regimen were ordered. (T. 403) Plaintiff was seen at Sparks Regional Medical

Center after a syncopal event on April 24, 2012, which was determined to be likely secondary to

autonomic dysfunction, likely secondary to diabetes mellitus. (T. 412) Plaintiff admitted that she was

"erratic on her medications" prior to this. (T. 413) Musculoskeletal exam showed good tone and

range of motion. (T. 416) Plaintiff saw her physician for a follow-up visit in May, 2012, and she

again demonstrated some unspecified decrease in range of motion in her back. Decreased range of

motion in her back and extremities was noted in a visit in June, 2012. Plaintiff's conservative course of treatment with medications was continued without change. (T. 450-453)

At her initial visit at the Wilma P. Mankiller Health Center on September 20, 2012, Plaintiff reported that she was independent in all activities of daily living. (T. 463) While she reported pain in her legs, she did not advise of any back pain. (T. 463) Inconsistently, she described the general area of her pain/symptoms as her back. (T. 467) A general review of systems documented that Plaintiff was active and ambulatory, and while it noted positive for pain, she endorsed no stiffness, weakness, or swelling. (T. 467) No musculoskeletal exam was performed, but the neurological exam revealed that Plaintiff moved her extremities well and had a normal gait. (T. 469) Plaintiff was instructed in diabetes management. (T. 459) She then cancelled appointments to monitor her blood sugar readings on October 3 and October 11, 2012, and she failed to show up for her appointment on October 18, 2012. (T. 455, 457-458)

Following a minor motor vehicle collision on November 26, 2012, Plaintiff was seen at the emergency room at Sparks Regional Medical Center. She presented with complaints of headache and pain in her neck, low back, and right hip. (T. 492) On physical exam she displayed mild tenderness in her neck; normal tone, no swelling, and normal range of motion in her extremities, although endorsing some right hip tenderness; and, her back was non-tender with normal range of motion. (T. 493) A CT scan of Plaintiff's cervical spine showed some degenerative disc disease changes at the C5-6 and C6-7 levels. (T. 500) X-rays of Plaintiff's lumbar spine revealed narrowing of the L5-S1 disc space with no evidence of spondylolithesis; questionable mild concavity of the superior endplate of the L3 vertebral body; demineralized bones; and, a chronic appearing concavity of the superior endplate of the L1 vertebral body. (T. 501) She was diagnosed with cervical, lumbar, and hip strains,

and she was discharged home with instructions to follow up with her primary care provider. (T. 483-484)

Plaintiff followed up at the health clinic in December, 2012 and January, 2013 for management of her diabetes and diabetic supplies. On December 20, 2012, the musculoskeletal review documented no pain, no stiffness, no weakness, and no swelling. (T. 518) Plaintiff was in no acute distress, and no musculoskeletal examination was performed. (T. 518-519) During her visit to the clinic on January 7, 2013, it was noted that she did not have her blood sugar meter with her, she did not record her blood sugar readings in a logbook, and there was no information regarding her blood sugar readings in the past 30 days. (T. 507) To the Court, this seems consistent with the concerns expressed by Dr. Kralik a year before in January 2012 that Plaintiff deliberately engages in behaviors likely to "help her case along" by causing further deterioration of her health. (T. 360) In addition to the results of objective medical tests, an ALJ may properly consider the claimant's noncompliance with a treating physician's directions, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001), including the failure to take prescription medications, *Riggins,* 177 F.3d at 693, seek treatment, *Comstock v. Chater*, 91 F.3d 1143, 1146-47 (8th Cir. 1996), and to quit smoking. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997); *Choate v. Barnhart* 457 F.3d 865, 872 (8th Cir. 2006). Plaintiff described her pain on January 7, 2013 as being in her "neck all the way down," however, the review of her musculoskeletal system again documented no pain, no stiffness, no weakness, and no swelling. (T. 510, 511)

Plaintiff began seeing the Wellness Clinic of Roland for pain management in October, 2012. (T. 528) She was treated conservatively with pain medication and Voltaren gel. She reported that the Voltaren gel was working well during her visit on January 15, 2013, but she expressed an inability

to afford the Voltaren gel "right now" during an office visit on February 12, 2013. (T. 524, 525) At the administrative hearing on March 12, 2013, Plaintiff testified that she had the Voltaren gel and "it works," and that the other pain medication helps with her pain. (T. 78) *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain); *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997) (concluding that, if an impairment can be controlled through treatment or medication, it cannot be considered disabling).

Although it is clear that Plaintiff suffers from some degree of pain and discomfort, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).

As for the opinion evidence, after reviewing Plaintiff's medical history, a non-examining consultative physician, Judith Forte, M.D., completed a Physical Residual Functional Capacity Assessment on February 22, 2012 concluding that Plaintiff could perform light exertional level work. (T. 393-401) Notably, Dr. Forte's RFC assessment did not include any postural limitations, including stooping. (T. 395) Dr. Forte's physical RFC opinion was reviewed and affirmed by Jerry Thomas, M.D. on May 14, 2012. (T. 442) The ALJ gave some weight to these opinions, finding them to be consistent with other evidence in the record, such as the Plaintiff's abilities at the consultative examination. (T. 24)

Plaintiff provided no contrary RFC assessment by another physician, treating or otherwise.

Thus, the ALJ had an adequate medical basis to find Plaintiff had the RFC to perform light work.

*See Moore v. Astrue* 572 F.3d 520, 523-524 (8th Cir. 2009); *Raney v. Barnhart*, 396 F.3d 1007,

1010 (8th Cir. 2005) (concluding that one consulting physician's RFC assessment supported the

ALJ's RFC finding when none of the claimant's treating physicians opined she was unable to work).

The ALJ considered and discussed the evidence of record as a whole, including treatment

records, consultative examinations, state agency reviewing physician opinions, and Plaintiff's

reported activities of daily living in reaching his RFC finding, and the ALJ properly accounted for

any limitations supported by the evidence by restricting Plaintiff to light exertional level work.

Accordingly, substantial evidence supports the ALJ's RFC finding that Plaintiff can perform

unskilled light work involving simple tasks and instructions with only incidental interpersonal

contact with others.

## IV. Conclusion

Having carefully reviewed and considered the entire record, the Court finds that substantial

evidence supports the ALJ's Decision denying Plaintiff SSI benefits. The ALJ's Decision should be,

and it hereby is, affirmed. Plaintiff's Complaint should be dismissed with prejudice.

DATED this 30th day of December, 2015.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE